Estate of Arthur Padelford, deceased. Appeal of the Land Title and Trust Company, Guardian of Valerie Batthyhany Padelford, minor child of Arthur Padelford, deceased.

*Wills—Communication—Revocation.*

A will in which a father excludes a child whose paternity he denies is not revoked by the fact that he subsequently, in answer to a bill in equity filed by the child by her next friend for support, acknowledges his paternity, if, after said acknowledgment, he makes a codicil to the will without changing its provisions in reference to the child, and his entire subsequent conduct shows that his real opinion as to the paternity of the child had not changed.

Argued Jan. 9, 1899. Appeal, No. 196, Jan. T., 1898, by the Land Title and Trust Company, from decree of O. C. Phila. Co., Oct. T., 1897, No. 269, sustaining exceptions to adjudication. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Exceptions to adjudication.

The facts were found by the auditing judge, HANNA, as follows:

It appeared in evidence that testator on May 6, 1881, by deed of that date, assigned and transferred to Crawford Arnold, his heirs, etc., "All the securities, certificates, estate and property, real and personal, belonging to said Arthur Padelford, and especially all the property, estate and securities coming or to come to him from the estates of his grandfather Edward Padelford, and his father Edward Padelford, to hold in trust, etc., and pay over the net income to the said Arthur Padelford during life, free from liability for his debts, etc., and upon his decease to assign, transfer and convey the same to such person or persons, etc., as he the said Arthur Padelford may direct and limit by will, but, if he should die without leaving such will, then to assign, etc., to such person or persons as would be entitled thereto under the intestate laws of this state," etc.

On October 21, 1885, said Arthur Padelford married Elizabeth G. Ordway, daughter of Gen. Albert Ordway, of Washington, D. C. Soon thereafter he with his wife visited the continent of Europe and resided in Paris, Vienna, and other cities. In September, 1887, testator and his wife were located in Paris, and there, on September 17, 1887, a child was born subsequently named Valerie Batthyhany Padelford. Shortly thereafter, testator requested his wife to return to the United States, taking her child with her. This she did, and, upon her arrival, proceeded to the residence of her father, in Washington, D. C., where she remained for some time, and where her child, the said Valerie, has continued to reside, so far as was shown to the contrary, up to the death of her grandfather, General Ordway, which occurred on November 21, 1897.

The testator did not return to the United States with his wife, but soon after her departure again visited Vienna, and there commenced proceedings to obtain a divorce from her a. v. m. This proceeding was carried on, with notice to his wife, but who did not appear nor make any defense. During the pendency of these proceedings to obtain a divorce, testator executed his last will and testament. It is dated June 14, 1888, and by it he bequeathed the following pecuniary legacies, to wit:

| To his aunt Alice Blackford . . . . | $25,000 |
|---|---|
| To his aunt Ellen Read . . . . | 25,000 |
| To his aunt Elizabeth Mercer . . . . | 25,000 |
| To his executors, to be expended in charities | 25,000 |

All free from collateral and other tax.

To his executors, in trust for his mother, Kate
Holman, for life, with remainder, etc. .     .     50,000
Also free from taxes.

Testator also, for reasons stated in his will, declared that no part whatever of his estate shall come to, or be paid to, his wife; and further, that a daughter of said wife, born since his marriage to her, was not his child, and that in no event shall she inherit or be entitled to any part of his estate, nor any portion or share of his grandfather's estate held in trust for him for life with remainder to his children after his decease, as the said daughter of his wife was not one of his children.

And all the rest and residue of his estate he gave and devised to his executors in trust for his brother, Edward M. Padelford, for life, etc., as fully set forth in the will.

As before stated, the action in divorce was then pending, but it appears that on May 17, 1889, a final decree was entered in favor of the testator, and his marriage with his said wife was annulled and dissolved.

It was not shown when the testator returned to the United States; but it did appear that on October 17, 1892, a bill in equity was filed in the court of common pleas, No. 3, of this county, to September term, 1892, No. 315, by the said minor, Valerie B. Padelford, by her next friend and grandfather, Albert Ordway, against Crawford Arnold, trustee for the testator, Arthur Padelford, and said Arthur Padelford personally, as defendants.

Without reciting all the allegations of the bill, it will suffice to say that the complainant, by her next friend, averred that she is the child of said Arthur Padelford, the testator, and his wife; that she was born on September 17, 1887, and is in her sixth year; that her said father has wholly neglected and refused to provide for her education and maintenance; that he is in possession of and entitled to a large income and property; and she therefore prayed that an allowance should be made out

of the estate of her father, to be paid by his said trustee for her support, etc., in such manner as to the court shall seem proper.

On May 26, 1894, an answer was filed to the said bill by Arthur Padelford, the father of the minor complainant, in which, inter alia, he admitted that she is his child; that she was born in Paris, and he immediately cabled the fact of her birth to her grandfather in Washington, D. C.; that he instructed his wife to return with his and her daughter to this country; that they so returned and proceeded to his wife's father's house with her daughter, who has continued there to reside with her grandfather; and further, that he instructed her grandfather to have his child registered in the parish record of St. John's Church, Washington, D. C., where she was baptized, of which fact he received information and notice. He also averred in his answer that "he is now and has been at all times ready and willing to provide for the support, maintenance, and education of his said child in a manner befitting her station to the best of respondent's means and ability, but respondent desires the custody and control of his said child and to exercise the supervision over her education, which heretofore has not been granted to him; but the custody of said child has been retained, and is still retained," by her grandfather, "who has refused to surrender said child to respondent, although demand has been made by respondent upon him for her."

He also denied that he has "neglected to perform his duty as father of said child, but is at all times ready, willing, and anxious to receive complainant into his family, and to maintain and educate her."

And he finally prayed the court to dismiss the bill, and "direct that the custody of said Valerie Batthyhany Padelford be awarded respondent in order to enable him to provide for her education, maintenance, and support."

During the pendency of the proceedings in the court of common pleas in equity before mentioned, and three months prior to the filing of his answer to the bill in equity, testator executed a codicil to his will. It is dated February 23, 1894, and reads as follows: "Codicil to my will. I, Arthur Padelford, do hereby appoint my executors or the appointees thereof the guardians of the persons and estates of any children that I may leave to survive me, who are to have charge of all property coming to

them from me or from my grandfather's estate or from any source whatever, and, in the event of them or either of them being unable to serve, under no circumstances do I wish the court to appoint as such guardians or care-takers of the property of my children General Ordway, of Washington, or any of his descendants, relatives or appointees."

As already stated, testator's answer to the bill in equity filed against him was sworn to on April 26, 1894. On the same day an agreement in writing was entered into and executed by and between the testator of the first part, his said daughter Valerie, by her next friend and grandfather, of the second part, and her said grandfather, of the third part, wherein it is set forth:

" That in consideration of love and affection, and in pursuance and execution of a certain compromise entered into by and between the parties hereto in certain proceedings in equity in the court of common pleas No. 3 of Philadelphia county of September term, 1892, No. 315, wherein the said party of the second part hereto was the complainant, and the party of the first part hereto and others were defendants, it is understood, covenanted, and agreed by and between the parties hereto as follows:

" 1. The said Arthur Padelford acknowledges that the said Valerie Batthyhany Padelford is his lawful child, born in Paris, France, in lawful wedlock, on the seventeenth day of September, A. D. 1887, by his then wife Elizabeth Godwin Padelford."

" 2. The said Albert Ordway " (grandfather of said Valerie) " covenants and agrees to and with the said Arthur Padelford, that he will retain the custody of, maintain, educate and support the said Valerie until her twelfth birthday, to wit, the seventeenth day of September, A. D. 1899, to the best of his means and ability, at his sole expense, excepting in so far as the said Arthur Padelford may voluntarily of his own free will and accord contribute in money or otherwise to the cost and expenses thereof," etc.

The said Albert Ordway agreed to instruct the said Valerie in her true relationship to the said Arthur Padelford. And also " that the said Arthur Padelford shall have full and free access to his said daughter and to her companionship at the home of said Albert Ordway as often and for such lengths of time as he the said Arthur Padelford may choose," etc.

The said Arthur Padelford also agreed that said Albert Ordway shall retain the custody of, maintain, educate, and support the said Valerie "until her twelfth birthday, in manner aforesaid," etc. And that on the 17th day of September, 1899, and earlier, for reasons set forth in the agreement, the said Arthur Padelford "will assume the custody of the said Valerie, and will thereafter give her a home, and educate, maintain and support her in a manner suitable to and befitting her station in life, present and future, as the daughter of the said Arthur Padelford."

He also agreed not to attempt to alienate her affection for her grandparents, or either of them, nor prevent them from seeing or visiting each other, "nor do anything which may change or be likely to change her feelings of affection and regard for them."

And said Albert Ordway further agreed "that under no circumstances shall the custody of the said Valerie . . . . be surrendered by him to any other person than the said Arthur Padelford or some one designated by him."

It further appeared that testator, on March 27, 1895, remarried, and died on June 7, 1896, leaving surviving his widow, Mrs. Edythe Grant Padelford, and his said daughter, Valerie Batthyhany Padelford, both of whom are still living, and the latter yet a minor.

The auditing judge awarded one third of the estate to testator's wife, and two thirds to his daughter Valerie.

Exceptions to the adjudication were sustained by the court in banc, PENROSE, J., filing the following opinion:

A will may be revoked by implication where, after its execution, "the occurrence of new social relations and moral obligations raises a presumption of a change of intention in the testator" (4 Kent, 521); such revocation, it is said, being "founded upon the reasonable presumption of an alteration of the testator's mind, arising from the circumstances so arising since the making of the will, producing a change in his previous obligations and duties:" Young's Appeal, 39 Pa. 115. Whether revocation can be implied from any change which does not involve new duties and obligations, not before existing, as in the case of marriage or birth of issue after the mak-

ing of the will, may well be doubted; certainly where a father, acting under the impulse of anger or resentment, no matter how occasioned, gives his estate away from one of his children who has incurred his displeasure, his subsequent forgiveness and reconciliation, no matter how absolutely it may be demonstrated by parol proof, will not change the written instrument. It is true that a legacy induced by deception, as in the case of one pretending to be the husband or wife of the testator, may, upon proof of the fact, be treated as a nullity; but this is not on the ground of revocation, but because the perpetrator of fraud is never permitted to take advantage of it. And so where the will is made under a palpable mistake of pure fact, as where the testator acts under the belief that one for whom he would otherwise provide is dead when in truth he is living, a court of equity may, perhaps, have power to afford relief by reforming the instrument so executed. But none of these principles apply to the case before us. The will excluded the wife of the testator for reasons there set forth. Her right, however, to take against the will, in spite of these reasons, the sufficiency of which, in a moral point of view, could not be questioned, would not have been affected had it not been barred by a divorce subsequently obtained by the testator in a proceeding in which he was libellant. That the reasons so stated afforded just ground for the belief which led him to exclude the child born before the marriage was thus dissolved must be conceded, and whether the actual fact with regard to relationship was or was not what he supposed, his absolute right so to exclude was wholly independent of it, or of the legal principle which, under the maxim pater est quem nuptiæ demonstrant, imposed upon him the duties of a father irrespective of even positive proof, a principle strikingly illustrated by the well-known case of Page v. Dennison, 29 Pa. 420, emphasized by the vigorous dissenting opinion of Judge LOWRIE, reported in 1 Grant, 377.

The testator, however, not only excluded the child from any participation in his estate, which he had a right to do, but attempted to exclude her from taking under a limitation in the will of his grandfather, which was beyond his power; and in October, 1892, four years after the execution of the will, a bill in equity was filed on her behalf by her maternal grandfather,

as next friend, averring that the testator, though possessed of great wealth, had wholly neglected and refused to provide for the support, etc., of the complainant, or to contribute anything for that purpose, and that she had, from a short time after her birth, been supported by and had resided with the grandfather, so conducting the proceeding as her next friend. The duty of the father to furnish support, etc., in a manner befitting her social position was averred, and appropriate relief prayed for. The bill was not served on the testator until June, 1893, and afterwards, in pursuance of an agreement of compromise, executed April 26, 1894, the testator filed an answer to the bill, denying that he had neglected to perform his duty as father of the child, and alleging that he "is now and has been at all times ready and willing to provide for the support," etc., but that the maternal grandfather, the next friend, had retained her in his custody, and refused to surrender her, though duly called upon, etc. The answer, though not actually filed until May 26, was sworn to April 26, 1894, which was the date of the compromise. From the report of an auditor in the estate of Edward Padelford, it would seem that the bill in equity, though ostensibly to compel maintenance by the testator, was really designed to obtain recognition of the legal status of the child, and avoid any obstacle in the way of her taking under the limitation to his children in the will of Edward Padelford, his grandfather.

The agreement of compromise contained an acknowledgment by the testator that the child was "his lawful child, born in Paris, France, in lawful wedlock, on September 17, 1887, by his then wife." It contained a covenant by the grandfather that he would retain the custody, and maintain and educate the child, at his sole expense, until her twelfth birthday, viz: September 17, 1899, the testator to have in the mean time "full and free access to his said daughter and to her companionship, . . . . as often and for such length of time as he may choose," at the grandfather's house, or to have her visit him at his own residence as often as he and she might agree. The testator covenanted, on his part, that after her twelfth birthday, or sooner if she should be willing, he would assume her custody and thereafter "give her a home, and educate, maintain, and support her in a manner suitable to her station in life, present and future," as his daughter, etc. The

parties to this agreement were the testator, the child, by her next friend, and the grandfather in his own right; and it was expressed to be "in consideration of love and affection and in pursuance and execution of a certain compromise entered into between the parties," in the proceeding in equity.

It is not easy to find in the facts thus brought to the attention of the court anything to sustain the assertion of implied revocation of the will. There is simply a recognition of a legal liability from which there was no escape, with nothing whatever which altered the "previous obligations and legal duties" of the testator, or gave rise to a "reasonable presumption of change" of testamentary purpose. It is true the agreement of compromise contains the expression "love and affection" as constituting, in part, the consideration; but the "love and affection" thus manifested seem to have had their origin in the litigation, and, so far as the evidence discloses, it never found further expression. It does not appear that the testator at any time during the two years of his life following the compromise availed himself of the stipulated privilege of visiting or being visited by the child whose legal right he had thus recognized. Moreover, his answer to the bill in equity emphatically negatives the idea of changed feelings or relations. It declares, as already stated, that "he is now and has been at all times ready and willing to provide for his said child;" but he does not retract any of the assertions with regard to his wife, and there is no suggestion, still less proof, that the facts attending the birth of the child and the previous conduct of the mother were not precisely what he believed them to be. But the case does not rest here. It is shown, affirmatively, that the agreement and answer were the result of his being convinced by the advice of his counsel that in law he was the father, in spite of any knowledge he might have as to the fact, and that there was in reality no change in his feelings on the subject. That this evidence was admissible, we do not doubt. A presumption arising from facts occurring after the execution of the will is relied upon to establish revocation, and it is well settled that such a presumption (as contradistinguished from a conclusive presumption of law, "founded in the common consent of mankind and often expressed in statutes"), depending for its establishment upon proof of external circumstances, may be

ov.ercome by proof of the same character: Gill's Estate, 1 Parsons, 139; Miner v. Atherton, 35 Pa. 528.

Nor have we any doubt as to the competency of the witnesses by whom this was proved. Counsel may always testify in favor of the client, and the right to object to such testimony when offered against him on the ground of breach of professional confidence, is personal, purely, not passing at the client's death to a third party, Dowie's Estate, 135 Pa. 210, while in controversies with regard to devolution of title of a decedent, interest, by the express provision of the act of 1887, is no disqualification: Comly's Estate, 6 Dist. Rep. 119. Besides, the facts were fully proved by a witness who was neither counsel nor interested, and the testimony of the others may be excluded without affecting the result.

Pending the negotiations for compromise, and after the testator had been fully advised as to his status with regard to the child and his consequent right to appoint a testamentary guardian, he executed a codicil as follows: " Codicil to my will: ' I . . . . do hereby appoint my executors or the appointees thereof the guardian of the persons and estates of any children that I may leave to survive me, who are to have charge of all property coming to them from me or from my grandfather's estate or from any source whatever, and, in the event of them or either of them being unable to serve, under no circumstances .do I wish the court to appoint as such guardians or caretakers of the property of my children General Ordway, of Washington, or any of his descendants, relatives, or appointees." This codicil was a republication of the will as of the date of its execution, February 23, 1894. It was made general, as the evidence shows, because he contemplated the possibility of a future marriage and the birth of children. Subsequently born children, of course, would acquire an interest in his estate notwithstanding the will, while the power of the guardians under his appointment for the child already born would, under well-settled principles, extend to all property of the ward, irrespective of the source from which it came: Sheetz's Estate, 6 Dist. Rep. 367. It may be that the subsequent agreement that the grandfather should retain custody of the person until 1899 would be operative notwithstanding the codicil, since the statute of Charles II., which permitted an appointment by deed as well

as will, has not been superseded in this respect by our act of assembly; but that the operation of the codicil is to change in any way the disposition of the estate of the testator as declared by the will, is contrary to well-settled principles. The rule has been established by innumerable decisions that "the dispositions of the will will not be disturbed further than is absolutely necessary for the purpose of giving effect to the codicil;" or, as was said by TINDAL, C. J., in Doe v. Hicks, 8 Bing. 479, "where a devise in a will is clear, it is incumbent on those who contend that it is not to take effect by reason of a revocation in a codicil, to show that the intention to revoke is equally clear and free from doubt as the original intention to devise." See Williams on Executors, 9, 10, 220, Wetter's Appeal, 20 W. N. 499, Sheetz's Appeal, 82 Pa. 213, and Whelen's Estate, 175 Pa. 23.

It was conceded by counsel for the exceptants that the rights of the second wife were determined, so far as this court is concerned, by the ruling in Young's Appeal, supra, even if the case did not fall within the principle of Mackason's Appeal, 42 Pa. 330, cited by the auditing judge. We are relieved, therefore, from considering the exceptions relating to this subject, and they are accordingly dismissed. The exceptions, so far as concerns the award of any portion of the estate to Valerie B. Padelford, are sustained, and the adjudication modified accordingly.

Counsel will prepare the necessary decree.

FERGUSON, J., being engaged in hearing appeals from the register of wills, did not sit at the argument of this case.

HANNA, P. J., dissenting, April 30, 1898:

If any departure from the strict letter of the statute, Act of April 8, 1833, P. L. 250, sections 13 and 14, is to be permitted, and the doctrine of an implied revocation of a will recognized by the courts of this state, the facts proved in the present case call for such a departure and application of the doctrine. Being of this opinion, and for the reasons stated in the adjudication, I must dissent from the conclusion reached by the majority of the court, so far as it sustains the exceptions.

The court entered the following decree:

And now, this 6th day of May, 1898, it is ordered and decreed that the exceptions filed to the adjudication, so far as concerns

the award of any portion of the estate to Valerie B. Padelford, are sustained, and the adjudication is ordered to be modified accordingly; and the exceptions to the adjudication so far as concerns the award of Edythe Grant Padelford are dismissed.

*Errors assigned* were in sustaining exceptions to adjudication.

*A. T. Freedley*, with him *Wm. Brooke Rawle*, for appellant.—A testamentary disposition based upon mistake of fact is invalid: Kennell v. Abbott, 4 Vesey, Jr. 802; Wilkinson v. Joughin, L. R. 2 Eq. Cases, 319; Williams on Executors, 172–174; Kerr on Fraud and Mistake, 453; Gordon v. Gordon, 1 Merivale, 149; Campbell v. French, 3 Vesey, 321; Bransby v. Haines, 1 Lee's Ecclesiastical Cases, 120; Mendinhall's App., 124 Pa. 387.

The provisions of the agreement and testator's answer in equity were wholly inconsistent with the testamentary dispositions in the will, and show that these provisions in the will do not represent the last will and desire of the testator.

There was such a total change in the circumstances of the testator's family as of itself revoked dispositions made on the assumption that those circumstances did not exist: Cook v. Oakley, 1 P. Williams, 302; Doe v. Lancashire, 5 Durnford & East, 58; Nebinger's App., 185 Pa. 404; Tomlinson v. Tomlinson, 1 Ashmead, 228; Lugg v. Lugg, 2 Salkeld, 592; Warner v. Beach, 4 Gray, 163; Marston v. Roe, 8 Adolphus & Ellis, 14, Chace v. Chace, 6 R. I. 407; Thorne v. Rooke, 2 Curteis, 799; Doe v. Evans, 10 Adolphus & Ellis, 228; Martindale v. Warner, 15 Pa. 471; McKnight v. Read, 1 Wharton, 213.

The foregoing doctrines apply whether the will was a general testamentary disposition or the exercise of a power of appointment: Young's App., 39 Pa. 115; Lines's Est., 155 Pa. 378; Du Bois's App., 121 Pa. 368; Reish v. Com., 106 Pa. 521; Chestnut St. Nat. Bank v. Fidelity Ins., etc., Co., 186 Pa. 333.

In such cases the revocation (like the revocation by birth of children subsequent to the will) is pro tanto only, and the proper method of raising the question is at the audit of the account, and not by proceedings to set aside the probate of the will, for so much of the will not connected with the mistake of fact stands, such as the appointment of executors, directions to pay debts, powers conferred, etc.: Marshall v. Marshall, 11 Pa.

431; Coates v. Hughes, 3 Binney, 498; Baxter's App., 1 Brewster, 459; Edwards's App., 47 Pa. 144; Hollingsworth's App., 51 Pa. 518; Hegarty's App., 75 Pa. 515; Whitney's Est., 20 W. N. C. 37; Robeno v. Marlatt, 136 Pa. 42; Doane v. Lake, 32 Me. 268.

The testator's codicil shows his intention that the appellant should be entitled to his estate when acknowledged to be his child.

*John G. Johnson,* for appellee.—A will in favor of A, not brought about by the action, fraudulent or otherwise, of A, is valid although it discloses the fact that concerning B, the heir, the testator held a mistaken belief as to a matter affecting his feelings towards him: Baxter's App., 1 Brewster, 459; Boughton v. Knight, L. R. 3 P. & D. 64; Middleditch v. Williams, 45 N. J. Eq. 726; Matter of O'Dea, 84 Hun, 591; Cole's Will, 49 Wis. 181.

The belief which Padelford entertained concerning the paternity of his child at the time he executed his will rested upon facts from which a man of sound mind could deduce the same. Though, subsequent to the execution of his will, he had become convinced that the belief he entertained at the time of such execution was erroneous, no revocation resulted from the change of opinion. He never did change his belief as to the paternity of his child. He never altered his determination that it should take nothing under his will: Hoy v. Morris, 13 Gray, 519; Glover v. Patten, 165 U. S. 406.

The answer in equity and the agreement executed in 1894 resulted from no change of Padelford's belief as to the paternity of his child, but from the advice of counsel that the law obliged him to recognize it as legitimate.

The codicil of 1894 was made, because of the compromise which resulted in the agreement and answer. It disclosed Padelford's unchanged determination and belief concerning his child.

Under the Wills' Act of 1833, a will may be revoked: (1) by some other will or codicil in writing duly executed; (2) by burning, canceling, obliterating or destroying the will; (3) by subsequent marriage of testator, or subsequent birth of children not provided for. These modes, being statutory, are exclu-

sive of all others : Lewis v. Lewis, 2 W. &. S. 455; Clingan v. Mitcheltree, 31 Pa. 25; Heise v. Heise, 31 Pa. 246; Dixon's App., 55 Pa. 424; Fox v. Fox, 88 Pa. 19; Davis v. King, 89 N. C. 441.

PER CURIAM, February 15, 1899 :

The testator made no change in the provisions of his will in the codicil which he subsequently made. He did not revoke any of the legacies given by the will and he gave nothing to the ward of the appellant. The same comment must be made as to the testator's action after he recognized the legitimacy and his own paternity of his daughter, and asserted it in his answer in the equity case, and in the agreement with Ordway. He made no change in his will after that. We are satisfied with the reasons given by the learned court below for the decree made, and we affirm the decree on the opinion of the court.

Decree affirmed and appeal dismissed at the cost of the appellant.